IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Josephine Jackson, | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 1145 C.D. 2020 |
| | : | ARGUED: October 18, 2021 |
| Delaware County Tax Claim | : | |
| Bureau, Bid Properties, LLC, | : | |
| and Kenyon Jackson | : | |

BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                    FILED:  November 18, 2021

Josephine Jackson (Taxpayer) appeals from the October 9, 2020 order of the Court of Common Pleas (trial court) of Delaware County (County), which denied Taxpayer's petition (Petition) to set aside the judicial sale of real property located at 603 Penn Street, Yeadon, Pennsylvania (the Property).  The issue on appeal[1] is whether the trial court erred in failing to set aside the judicial sale because the sale price was grossly inadequate and Taxpayer's son, Kenyon Jackson (Jackson), testified that he could satisfy the outstanding tax debt on the Property.[2]  After review, we affirm the trial court.

---

[1] Our review in tax sale cases is limited to determining whether the trial court abused its discretion, rendered a decision without supporting evidence, or clearly erred as a matter of law. *Husak v. Fayette Cnty. Tax Claim Bureau*, 61 A.3d 302, 306 n.6 (Pa. Cmwlth. 2013).

[2] Taxpayer asserts additional arguments in her appeal; however, as will be more fully discussed herein, those issues are waived, as they were not raised before the trial court.  Issues not raised before the trial court are waived and cannot be raised for the first time on appeal.  Pa. R.A.P. 302(a).

## I. Background

The underlying facts in this matter are largely undisputed. Taxpayer purchased the Property, a single-family residence, on June 21, 1957. Original Record (O.R.), Item No. 1. It is currently used as a rental property. Notes of Testimony (N.T.), 7/21/2020, at 11. Due to delinquent taxes owed on the Property,[3] the County Tax Claim Bureau (Bureau) filed a petition on January 4, 2017, seeking to dispose of the Property by judicial sale. Reproduced Record (R.R.) at 35a-36a. The Bureau sent Taxpayer notice of the judicial sale by certified mail to Jackson's San Diego, California address.[4] O.R., Item No. 1, Ex. A. Jackson signed the certified mail receipt on February 6, 2017. R.R. at 39a. The Bureau also mailed notice of the judicial sale by first-class mail to Taxpayer at the assisted living facility in which she resided. *Id.* at 40a.

Thereafter, by means of an April 28, 2017 agreement (Agreement) between Taxpayer and the Bureau, the judicial sale of the Property was continued from May 3, 2017, until September 14, 2017. O.R., Item No. 1, Ex. B. Per the terms of the Agreement, Taxpayer would satisfy the delinquent taxes due on the Property, with an initial payment of $2,000 due on or before May 3, 2017, a second payment of $2,000 due on or before July 31, 2017, and the balance paid on or before August 31, 2017. *Id.* In the event Taxpayer failed to comply with the payment terms, she agreed that she would not file any action to stay or otherwise prevent the September 14, 2017 judicial sale. *Id.* Taxpayer also acknowledged that, "if no further agreements [were] made with the [Bureau]," the Property would be sold at the September 14,

---

[3] The tax debt on the Property as of February 6, 2017, totaled $6,476.48. N.T., 7/21/17, at 109.

[4] Jackson acted as Taxpayer's agent pursuant to a durable power of attorney executed in June 2013. R.R. at 39a.

2017 judicial sale, with no additional notice provided by the Bureau, including any notice of default. *Id.*

Jackson's counsel mailed the first payment of $2,000 on May 2, 2017. O.R., Item No. 1, Ex. C. Jackson mailed a second $2,000 payment in September 2017, along with a letter dated September 1, 2017, in which Jackson indicated that a final payment of $2,476 would be made by October 14, 2017. *Id.*, Ex. D. The Property was subsequently sold for $17,000 at the September 14, 2017 judicial sale. R.R. at 55a.

Taxpayer filed her Petition on October 13, 2017, asserting that the September 2017 payment was an attempt to "reach 'further agreement'" with the Bureau, as provided for in the Agreement. O.R., Item No. 1, ¶ 20. Jackson understood that, by making the second payment, the Property would not be sold at judicial sale. *Id.* Taxpayer estimated that the Property's value ranged from $84,900 to $129,000 but that she would only receive approximately $8,000 from the proceeds of the judicial sale. *Id.*, ¶¶ 22-23. Given that Taxpayer paid $4,000 towards the Property's outstanding tax debt, its subsequent sale was "grossly unfair." *Id.*, ¶ 24. While Taxpayer conceded that she had no statutory right to redeem the Property, she was "ready, willing[,] and able to complete the payments" required under the Agreement. *Id.*, ¶ 27. Accordingly, Taxpayer requested that the trial court exercise its equitable powers and set aside the judicial sale in the "interest of justice," pursuant to Rule 3132 of the Pennsylvania Rules of Civil Procedure (Rule 3132). Pa.R.Civ.P. 3132.[5] *Id.*, ¶¶ 28-29.

---

[5] Rule 3132 provides that, "[u]pon petition of any party in interest before delivery of the personal property or of the sheriff's deed to real property, the court may, upon proper cause shown, set aside the sale and order a resale or enter any other order which may be just and proper under the circumstances."

3

The trial court granted the purchaser of the Property, Bid Properties, LLC (Intervenor), intervenor status and held a hearing on Taxpayer's Petition. O.R., Item No. 8. Jackson testified on Taxpayer's behalf. Intervenor presented the testimony of Sherri Eyer, counsel for the Bureau, and Kimberly Kenney, the Bureau's judicial sales coordinator.

Jackson testified that he immediately contacted the Bureau upon receiving notice that the Property would be sold at the May 3, 2017 judicial sale. N.T., 7/21/20, at 14. At that time, he was advised by one of the Bureau's staff that nothing could be done to prevent the judicial sale. *Id.* Thereafter, Jackson retained counsel, who negotiated the terms of the Agreement with Eyer. *Id.* at 15-16. Jackson asserted that he fully intended to comply with the payment structure in the Agreement; however, he suffered a financial setback in June 2017 due to his mother's medical expenses. *Id.* at 18-20. In July 2017, Jackson attempted to contact Eyer by telephone to request a modification of the Agreement's payment terms. *Id.* at 22. Ultimately, Jackson mailed the Bureau a cashier's check for $2,000, along with a letter dated September 1, 2017, "explaining what [he] hope[d] to do" with respect to the final payment. *Id.* at 22, 25. Jackson had no further contact with the Bureau until after the September 14, 2017 judicial sale had taken place. *Id.* at 24. The Bureau returned Taxpayer's $2,000 cashier's check with no explanation. *Id.*

Jackson stated that he mailed the cashier's check and September 1, 2017 letter to the Bureau with the understanding that, "within reason[, the A]greement could be changed or modified." *Id.* at 29. He advised that the Property's tax-assessed value at the time of the judicial sale was $69,840, and comparable properties were selling for $95,000 to $110,000. *Id.* at 33, 40; O.R., Item No. 1, Ex. F. Intervenor objected to introduction of Taxpayer's report of comparable property values, as it was

obtained from an online database by Taxpayer's counsel, who established the parameters of the property search, and it was unclear what those parameters were with regard to location, condition, and square footage. N.T., 7/21/20, at 36. Taxpayer's counsel conceded that Jackson did not prepare the report himself; however, Jackson did discuss the results with Taxpayer's counsel, and Jackson had "knowledge of the properties and the sale prices." *Id.* at 35, 37. The trial court allowed Taxpayer's counsel to continue questioning Jackson about the report, noting that it would give the document "the weight . . . it deserves." *Id.* at 37. As to his knowledge of real estate and qualifications to review the properties listed on the report, Jackson related that he is not a realtor, but he "know[s] quite a few people who are[,]" and Jackson has "studied to take the real estate test . . . ." *Id.* at 39.

During cross-examination, Jackson acknowledged that he had not paid the Property's outstanding tax debt, which he agreed had increased due to additional assessments made after the September 14, 2017 judicial sale.[6] *Id.* at 50. Jackson admitted that he could not write a check for the total amount in arrears, but he could pay a portion immediately and finance the remaining balance, to be paid within 30 days. *Id.* at 52. Jackson further admitted that Taxpayer continued to use the Property as a source of income following the September 14, 2017 judicial sale,[7] and that, aside from a six-month period during which the Property was vacant, Taxpayer had received between $1,000 and $1,300 per month in rental income. *Id.* at 48-49.

---

[6] The total amount of taxes due as of the July 21, 2020 hearing is unclear. While Jackson believed that the Property's tax debt was "[i]n the neighborhood of $30,000," Kenney testified that it was "around $25,500." N.T., 7/21/20, at 51, 107.

[7] Eyer related that the deed to Intervenor was never recorded, as proceedings were stayed when Taxpayer filed her Petition. N.T., 7/21/20, at 102. As a result, Taxpayer maintained ownership and possession of the Property after the September 14, 2017 judicial sale. *Id.* Intervenor's deed to the Property was eventually recorded on November 2, 2020. R.R. at 18a.

5

Jackson conceded that, although the letter he mailed with the $2,000 cashier's check was dated September 1, 2017, he obtained the cashier's check from his bank branch in San Diego, California on September 13, 2017. *Id.* at 57, 59; O.R., Item No. 1, Ex. D. Jackson agreed, therefore, that he did not mail the $2,000 cashier's check before September 13, 2017, and he had no proof that the Bureau received it prior to the September 14, 2017 judicial sale. N.T., 7/21/17, at 57. Jackson also agreed that he never discussed modifying the Agreement with Eyer, and his first written communication to her was the September 1, 2017 letter and cashier's check he mailed on September 13, 2017. *Id.* at 63, 73.

Eyer testified that her first contact in this matter came in an April 11, 2017 letter from Jackson's counsel that sought an agreement for paying the Property's outstanding tax debt. *Id.* at 99. Upon receipt of the signed Agreement from Jackson and the first $2,000 payment, Eyer continued the judicial sale of the Property from May 3, 2017, until September 14, 2017. *Id.* at 100. Eyer had no further communication with either Jackson or his counsel and she was only aware that Taxpayer failed to make the second $2,000 payment after the Property was sold on September 14, 2017. *Id.* at 100, 102. The Bureau received Jackson's letter and the $2,000 cashier's check on September 18, 2017. *Id.* at 101. Eyer testified that she might have granted Taxpayer an extension, given that she had made one payment towards the tax debt. *Id.* at 103-04. She confirmed, however, that no such agreement had been negotiated with the Bureau. *Id.* at 104.

Kenney testified that she was responsible for sending the judicial sale notices for the Property. *Id.* at 108. She advised that a note in the Property's tax sale file indicated that Jackson called the Bureau on February 6, 2017, after he received notice of the May 3, 2017 judicial sale. *Id.* at 108-09. The file did not reflect any

other contact from Jackson from the period of May 2, 2017, to September 14, 2017. *Id.* at 109.

The trial court issued its order denying Taxpayer's Petition on October 9, 2020. O.R., Item No. 34. Taxpayer appealed to this Court and filed a Concise Statement of Errors Complained of on Appeal (Concise Statement), in which she asserted four bases for challenging the trial court's denial of her Petition. First, Taxpayer argued that the trial court should have set aside the judicial sale because the $17,000 sale price received for the Property was grossly inadequate. O.R., Item No. 43, ¶ 1. Second, Taxpayer contended that the trial court erred in denying the Petition, as Jackson testified that he could satisfy the total amount of delinquent taxes on the Property. *Id.*, ¶ 2. Taxpayer next argued that a set aside of the sale was appropriate because the Bureau erroneously advised Jackson that nothing could be done to prevent the judicial sale. *Id.*, ¶ 3. Finally, she argued that the judicial sale must be set aside because the Bureau failed to give proper notice of the upset tax sale, as required by the Real Estate Tax Sale Law (RETSL).[8]

In its opinion issued pursuant to Pa.R.A.P. 1925(a)(1), the trial court noted that Taxpayer's third and fourth issues were not previously raised in either her Petition or her post-hearing memorandum of law. O.R., Item No. 45, at 2-3. As those issues were not properly preserved for appellate review, they could not form a basis for relief from the judicial sale. *Id.* Regarding Taxpayer's first two issues, the trial court noted that a tax sale is presumed to be valid and that "mere inadequacy"

---

[8] Act of July 7, 1947, P.L. 1368, *as amended*, 72 P.S. §§ 5860.101 – 5860.803. Pursuant to Section 601 of RETSL, in the event of a real estate tax delinquency, a county tax bureau may expose the property to an upset tax sale. 72 P.S. § 5860.601. Section 602 requires three different forms of notice to property owners prior to an upset tax sale: publication, posting, and mail. 72 P.S. § 5860.602. If the upset sale price is not bid, Section 610 of RETSL provides that the property may be exposed to judicial sale. 72 P.S. § 5860.610.

of sale price is not a sufficient basis for setting aside the sale. *Id.* at 3. The trial court found no support in the record for Taxpayer's contention that the sale price for the Property was "grossly inadequate." *Id.* at 4. It similarly dismissed Taxpayer's argument that a set aside was justified because Jackson testified that he could satisfy the total amount of tax arrearages. *Id.* The evidence presented at the July 21, 2020 hearing demonstrated the "utter incompetence" with which Jackson handled payment of the Property's tax debt, a fact acknowledged in Taxpayer's post-hearing memorandum of law. *Id.*; O.R., Item No. 31, at 2. Taxpayer's admission that Jackson was incompetent in handling her affairs significantly weakened her argument that Jackson could pay the remaining debt. *Id.* at 4. As the record offered no valid basis for the trial court to exercise its equitable powers, the trial court urged this Court to affirm its decision denying Taxpayer's Petition. *Id.*

## II. Issues

In her appeal to this Court, Taxpayer reiterates the arguments set forth in her Concise Statement, asserting that the trial court erred in failing to set aside the judicial sale where: (1) the sale price received for the Property was grossly inadequate; (2) Jackson testified that he could pay the outstanding tax debt; (3) Jackson was provided erroneous information by Bureau staff that nothing could be done to prevent the judicial sale; and (4) the Bureau failed to give notice of the upset sale, as required by Section 602 of RETSL.

## III.   Discussion

First, we address whether the trial court was obligated to set aside the judicial sale of the Property because the sale price was grossly inadequate.

The setting aside of a sheriff's sale is an equitable proceeding, and the party seeking a set aside bears the burden of proof. *Allegheny Cnty. v. Golf Resort, Inc.*,

8

974 A.2d 1242, 1245 (Pa. Cmwlth. 2009). It is presumed that the price received at a duly advertised public sale is the highest and best obtainable, and our courts have held that mere inadequacy of price, standing alone, is an insufficient basis for setting aside a sheriff's sale. *Id.* at 1247 (internal citations omitted).

Taxpayer acknowledges a presumption exists that the sale price obtained at the September 14, 2017 judicial sale was the "highest and best available." Taxpayer's Br. at 10. She maintains, however, that a set aside is warranted here, given that the Property sold for $17,000 and Jackson testified that comparable properties sold for $95,000 to $110,000. Given Jackson's "experience in real estate," and his competence to testify on the value of his mother's property, Taxpayer argues that the evidence demonstrated the Property was worth over $100,000. Taxpayer suggests that, because the sale price received for the Property is a fraction of its value, this Court should set aside the judicial sale. Alternatively, Taxpayer requests a remand for further proceedings on the adequacy of the sale price. In support, Taxpayer cites an unreported decision of this Court, *Hart v. Bulldawg LLC* (Pa. Cmwlth., No. 107 C.D. 2016, filed February 14, 2017).

In *Bulldawg LLC*, this Court reviewed whether the price received at a tax sale was grossly inadequate where real property with an alleged fair market value of $78,000, sold for $1,100. The trial court denied the petition of the property owner, Darren Hart (Hart), to set aside the sale because Hart failed to present evidence supporting the property's alleged fair market value. *Id.*, slip op. at 2. This Court agreed that Hart failed to substantiate his claim that the real property was worth $78,000. *Id.* at 4. Hart had, however, testified that he purchased the real property for $20,000. *Id.* We therefore concluded that the trial court erred in failing to evaluate the evidence and determine whether the sale price was grossly inadequate,

9

and we vacated the trial court's order and remanded the matter for a determination on the adequacy of the sale price. *Id.*

Taxpayer's reliance on *Bulldawg LLC* ignores this Court's ultimate resolution of that matter in *City of Philadelphia v. Hart*, 224 A.3d 815, 823 (Pa. Cmwlth. 2020), in which we concluded that the property's $1,100 sale price was not grossly inadequate, even though it represented a small percentage of the property's fair market value, which Hart's appraiser estimated to be $30,000. We noted that what constitutes a grossly inadequate price had not been fixed by the courts; rather, such a determination was based on all the facts of each case, and not simply the difference between a property's sale price and its fair market value. *Id.* at 822. In that regard, we considered the outstanding debt on Hart's property, which the parties agreed exceeded $35,000, and the fact that Hart would not be liable for that debt following the tax sale. *Id.* at 822-23. Simply put, Hart had no equity in the property, because the $35,000 debt encumbering the property surpassed its $30,000 fair market value. *Id.* at 823.

Instantly, we cannot agree with Taxpayer that a set aside or remand is required based on gross inadequacy of sale price, as her argument is, in part, guided by her perceived value of the Property, which she based on the report of comparable properties generated by her counsel. The trial court acknowledged this evidence, along with Jackson's testimony, in its October 9, 2020 order, but gave it little weight, concluding that Taxpayer failed to provide evidence that the sale price for the Property was grossly inadequate. O.R., Item No. 34 at 3-4. The trial court reiterated this conclusion in its February 4, 2021 opinion issued pursuant to Pa.R.A.P. 1925(a)(1). O.R., Item No. 45.

10

The trial court, as factfinder, has the exclusive authority to weigh the evidence, render credibility determinations, and draw reasonable inferences from the evidence presented. *Barylak v. Montgomery Cnty. Tax Claim Bureau*, 74 A.3d 414, 417 (Pa. Cmwlth. 2013). This Court may not make contrary credibility determinations or reweigh the evidence for the purpose of reaching an opposite result. *In re Sullivan*, 37 A.3d 1250, 1256 (Pa. Cmwlth. 2012). Nor would we, as Taxpayer's report contains no detail beyond the address of each property deemed "comparable" and its sale price, the number of bedrooms and bathrooms, and whether the residence is detached or semi-detached. O.R., Item No. 1, Ex. E. Jackson's alleged "knowledge of the properties and the sale prices" in the report is less than compelling, given that Jackson's real estate expertise is based on "know[ing] quite a few people who are realtors . . ." and having studied for "the real estate test." N.T., 7/21/20, at 39.

Jackson unquestionably had the legal authority to act on Taxpayer's behalf, and, in that capacity, he negotiated and executed the Agreement to pay the outstanding taxes. Jackson made one timely payment. Although Jackson testified that he attempted to contact Eyer by telephone in July to renegotiate payment terms, Jackson admitted that he never spoke with her. Jackson mailed his first written communication seeking an amendment to the payment schedule on September 13, 2017, one day prior to the tax sale and several weeks after the July 31, 2017 payment deadline.

Moreover, despite her failure to comply with the terms of the Agreement and resolve the Property's outstanding tax debt, Taxpayer continued to use the Property as a source of income throughout the approximate three-year period that followed the September 14, 2017 tax sale, charging her tenants between $1,000 and $1,300

11

per month. Even taking into account Jackson's testimony that the Property was vacant for six months, the record reflects that Taxpayer collected at least two years of rental income from the Property *after* it was sold at judicial sale.

Given that the Property was previously exposed to an upset sale that failed to generate bids sufficient to satisfy the upset price, and in consideration of Jackson's failure to comply with the Agreement's terms, his last-minute and unilateral attempt to renegotiate payment terms, and the rental income Taxpayer derived from the Property after the judicial sale took place, we are compelled to agree with the trial court that the $17,000 sale price received at judicial sale was not grossly inadequate in comparison to the Property's assessed value of $69,840.

Next, we address whether the trial court erred in denying Taxpayer's Petition, given that Jackson testified he could pay the outstanding tax debt. Taxpayer relies entirely on Jackson's testimony that he could pay the amount in arrears.

Taxpayer bore the burden of proving her circumstances warranted the trial court's exercise of its equitable powers. *Golf Resort, Inc.*, 974 A.2d at 1245. In rejecting Taxpayer's Petition, the trial court found that the evidence failed to establish a valid basis for setting aside the judicial sale, particularly given the "utter incompetence" with which Jackson handled Taxpayer's affairs, a view shared by Taxpayer in her post-hearing memorandum of law. O.R., Item No. 52, at 2.

We will not usurp the trial court's role as factfinder and cannot fault its disregard of Jackson's testimony, given his previous failure to comply with the Agreement and satisfy the Property's tax debt, as well as Jackson's explicit testimony that he could not pay the total amount in arrears as of July 21, 2020.

As to Taxpayer's third and fourth issues, our review of the record confirms the trial court's conclusion that Taxpayer failed to preserve these issues for appellate

12

review, having first raised them in her Concise Statement. Taxpayer's Petition does not contain a single allegation, even by implication, that the Bureau provided false information regarding Taxpayer's ability to redeem the Property prior to the date of the judicial sale.[9] The Petition is likewise bereft of any suggestion that the Bureau failed to comply with the upset sale notification provisions in RETSL.[10] Taxpayer's memorandum of law, which she submitted to the trial court following the July 21, 2020 hearing, fails to raise either issue. As a result, these issues are waived, and we will not address them further.

## IV. Conclusion

Based on the evidence presented, we conclude that Taxpayer failed to establish that the sale price obtained for the Property was grossly inadequate such that it warrants a set aside of the judicial sale. Taxpayer likewise failed to

---

[9] Taxpayer's Petition alleges that Jackson contacted officials in Yeadon, Pennsylvania, the borough in which the Property is located, to inquire about the "status of current and delinquent taxes" assessed on the Property. O.R., Item No. 1, ¶ 13. The Petition does not elaborate, however, on the substance of any conversations Jackson may have had with Yeadon officials, or suggest the relevance thereof as to separate actions taken by the Bureau.

Ultimately, even had Taxpayer raised this issue in her Petition, it would not form a basis for setting aside the September 14, 2017 judicial sale. While Jackson testified that he called the Bureau and was told nothing could be done to prevent the judicial sale, this conversation took place prior to the May 3, 2017 sale. N.T., 7/21/20, at 14. Jackson subsequently retained counsel, who negotiated the Agreement with the Bureau. It is irrelevant whether the Bureau's staff provided incorrect information regarding steps Jackson might have taken to prevent the May 3, 2017 judicial sale, as Jackson was clearly able to forestall that sale.

[10] Taxpayer avers in her Petition that the Bureau mailed delinquent tax notices to the Property but failed to send additional notifications to Jackson's address in San Diego, California or to Taxpayer's assisted living facility. She does not allege, however, that this constituted improper notice under RETSL, and she has not challenged the validity of the upset tax sale.

13

demonstrate that Jackson could pay the Property's outstanding tax debt and the trial court did not err in dismissing her Petition. Accordingly, we affirm the trial court.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Josephine Jackson,     :
     Appellant   :
          :
   v.       : No. 1145 C.D. 2020
          :
Delaware County Tax Claim  :
Bureau, Bid Properties, LLC,  :
and Kenyon Jackson    :

# **O R D E R**

AND NOW, this 18th day of November, 2021, the October 9, 2020 order of the Court of Common Pleas of Delaware County is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge